606 A.2d 553

**The AETNA CASUALTY AND SURETY COMPANY, the Automobile Insurance Company of Hartford Connecticut and the Standard Fire Insurance Company, Petitioners,**

v.

**INSURANCE DEPARTMENT Respondent.**

Commonwealth Court of Pennsylvania.

Argued Dec. 19, 1991.

Decided March 16, 1992.

Petition for Allowance of Appeal
Granted June 9, 1992.

396

M. Hannah Leavitt, for petitioners.

Heidi B. Hamman Shakely, Deputy Chief Counsel, for respondent.

Before COLINS and KELLEY, JJ., and LORD, Senior Judge.

LORD, Senior Judge.

This is an appeal by Aetna Casualty and Surety Company (Aetna) from two orders of the Insurance Commissioner. The first order of January 10, 1992 ruled on Aetna's objections to a draft report of a market conduct examination and issued certain cease and desist orders. The second order of February 25, 1991 imposed penalties on Aetna for certain violations discovered in the course of the investigation.

The market conduct examination and report in this case were made pursuant to the powers granted to the Insurance Commissioner by Sections 213 and 216 of the Insurance Act of 1921, Act of May 17, 1921, P.L. 789, *as amended,* 40 P.S. § 51 and § 54, respectively. Section 213 provides in part:

[The Insurance Commissioner] shall

without notice at least once annually during the first five years of existence of every domestic insurance company, association and exchange, and thereafter every four years, or oftener if he deems it to be necessary, personally or by his deputy, actuary, or examiners, visit each domestic insurance company, association, and exchange, and thoroughly inspect and examine its affairs to ascertain its financial condition and its ability to fulfill its obligations, whether it has complied with the provisions of law, and any other facts relating to its business methods and management, and the equity of its plans and its dealing with its policyholders and claimants.

\* \* \* \* \* \*

The Insurance Commissioner shall cause to be prepared a report of the examination of any domestic insurance company, association or exchange immediately upon completion of such examination. He shall submit such report to the domestic insurance company, association or exchange examined which shall have the privilege of objecting to any part of such report within thirty days from the receipt thereof. In the event any objection shall have been made, the Insurance Commissioner shall grant a hearing to the organization examined before making such report available for public inspection. Thereafter, he may, if he deems it for the interest of the public to do so, publish any such report or the results of any such examination as contained therein in one or more newspapers of the Commonwealth.

The market conduct examination was conducted from September 18, 1989 to November 1, 1989 and resulted in numerous findings and eleven specific recommendations. Pursuant to Section 213, Aetna accepted many of the recommendations but objected to some of the findings and recommendations in four general areas.

It is extremely important to an understanding of this case to set forth the procedure adopted thereafter by the Commissioner because, as the Insurance Commissioner points out in her opinion accompanying her adjudication, "the report on Aetna is the first report to proceed through the administrative hearing process pursuant to 31 Pa.Code Chapter 58." In accordance with accepted procedure, the Insurance Commissioner appointed a hearing officer, and a hearing was held. At the beginning of the hearing, the presiding officer outlined the issues to be considered and did not mention penalties. Throughout this entire hearing, there was only a single mention by the presiding officer of the possibility of penalties. That one instance took place in response to an evidentiary objection. (Notes of Testimony, 4/27/90, p. 317.)

After the hearing, the Insurance Commissioner made findings, based on the transcript of that hearing, on the

disputed items. On January 10, 1991, she issued an opinion and an order which upheld the market conduct report and made it available for public inspection. She also ordered Aetna to cease and desist from engaging in the following practices.

(a) Applying driving experience guidelines of Auto Rite I and II to drivers aged 16 to 25 years.

(b) Using the High loss Potential Vehicles list to nonrenew policies.

(c) Using accidents occurring under other, separate policies to nonrenew a current policy.

(d) Passively nonrenewing policies written through an agent that terminates its agency contract.

The Insurance Commissioner concluded her opinion as follows:

The parties in this proceeding were advised by the Presiding Officer that penalties would not be imposed at the conclusion and that a second, penalty proceeding would be scheduled. Accordingly, rather than impose penalties at this stage, the Commissioner will give the Department the opportunity to submit a memorandum outlining the penalty it recommends. Aetna shall be given the opportunity to respond. A final order imposing penalties will be issued after consideration of the recommendations.

(Order and Adjudication, 1/10/91, p. 39.)

Briefs were filed by both parties and on February 25, 1991 the Commissioner handed down an order imposing penalties of $96,000 on Aetna for the violations contained in the market conduct report. On January 10, 1991, the Commissioner issued an order and adjudication. Both of those orders have been appealed.

In this opinion, we shall address each of the matters decided in the January 10, 1991 adjudication and then address the penalties assessed in the February 25, 1991 order.

■ Our scope of review of an Insurance Commission order is limited to a determination of whether constitutional

rights have been violated, an error of law was committed or findings of fact were not supported by substantial evidence. *Travelers Indemnity Company of America v. Insurance Department* 63 Pa. Commonwealth Ct. 542, 440 A.2d 645 (1981).

## Inexperience vs. Age

■ Aetna's first argument needs no extended discussion. Aetna argues that the requirement of nine years "experience" (or five years "experience" if an insured has been an occasional driver on an Aetna policy for one year) to qualify for Auto–Rite I coverage and rates or five years experience to qualify for Auto–Rite II rates is a valid criterion of risk and not age discrimination prohibited by Act 78.

Aetna argues that, since the statute forbids "age" discrimination but does not forbid using experience as a factor, the Commissioner's order was an error of law. We disagree. It takes little figuring to conclude that the sixteen year old driver must wait at least until he is twenty-one to obtain the advantage of the rates of Auto–Rite II and if he is not an occasional driver under an Aetna policy he must wait until he is twenty-five before he can attain Auto–Rite I status.

On its face, this criterion discriminates against youthful drivers and was therefore properly prohibited by the order as unlawful under section 3(a)(1) of the act. See *Travelers Indemnity v. Insurance Department* 63 Pa. Commonwealth 542, 440 A.2d 645 (1981), where the court said "inexperience was in this case a subterfuge...." *Id.*, 63 Pa.Commonwealth Ct. at 545, n. 1, 440 A.2d at 646, n. 1.

Aetna makes two other arguments on this issue. It maintains that the Commission has allowed experience to be a factor under the Assigned Risk Plan and that, in a letter to Aetna, a department deputy in another instance allowed

it.[1]  These arguments are rejected as irrelevant to the issue before us now.

### Two Accident Rule

■ Aetna's next objection presents a narrow issue.  It involves a question of whether Aetna violated section 3(b) of Act 78, which provides that an insurer may not fail to renew a policy "on the basis of one accident not within a thirty-six month period prior to the upcoming anniversary date of the policy.  The Insurance Commissioner interprets policy to mean "same policy."  In this interpretation she is supported by *McDonnell v. Commonwealth Insurance Department*, 94 Pa. Commonwealth Ct. 381, 503 A.2d 1042 (1986), where this Court reversed the Commissioner and ruled that the insurer had not met its burden by showing more than one accident on a particular policy.  The Court held that the two accidents occurred on two different numbered policies.

Aetna argues that the policies involved here were the same policy because they covered the same risk and that they only had different numbers because that was a company practice under certain circumstances.

We agree with the Commissioner the accidents must occur under the same policy and Aetna may not use prior policies issued by other insurers or its own policies which it revives after termination under different numbers and claim they are the same policy.  This contention by Aetna is rejected.

Before the beginning our discussion of Aetna's two other objections, it is of extreme importance to point out that the legislature has set forth the comprehensive duties of the Insurance Commissioner in the investigation and preparation of a market conduct report and to note that these duties include not only the ascertainment of unlawful poli-

1.  The letter, marked as Aetna Exhibit No. 4 and admitted over objection, is an October 24, 1986 letter responding to a particular complaint of age discrimination in a case where Aetna used an underwriting guideline of age 71 or over.

cies but also "any other facts relating to [the company's] *business methods and management, and the equity of its plans and its dealing with its policyholders* and claimants." 40 P.S. § 51 (emphasis added).

Thus, the Commissioner has among other duties two separate functions relevant to this case in investigating and preparing a market conduct report. The first is to ascertain whether the company has "complied with the provisions of the law." The second is a broad function to investigate the business methods and to assess them as they relate to an insurer's dealings with its policyholders.

### High Loss Potential Vehicles (HLPV)

█ Aetna's next objection to the order of the Insurance Commissioner presents a more complicated issue. This issue involves the renewal of insurance on so called high loss potential vehicles (HLPV). Without stating all the various classifications of these vehicles, they include, for example, vehicles with a top speed potential in excess of 140 m.p.h. and an acceleration potential of zero to 60 m.p.h. in less than seven seconds or pickup trucks with exposed seating or vehicles with a significantly higher average cost of repair.

The development of this list of HLPV's by Aetna included the following sources: industry trade journals, highway loss data, insurance service office, the "blue books", the Insurance Institute for Highway Safety, National Highway Traffic Safety Administration and manufacturer supplied information.

The Commissioner reviewed all of the testimony presented by Aetna and concluded:

In summary, the Commissioner finds that the record does not support a finding that vehicles on the HLPV list present a material increase in risk of loss. There is no evience [sic] that the listed vehicles actually have the speed and performance capabilities alleged, and no evidence to prove Aetna's contention that the HLPV list is an indicator of operator responsibility that enables Aetna

to identify insureds that are more likely to exceed the speed limit or drive too fast for conditions. (Aetna brief at 31). That purchasers of HLPV cars will drive the cars as "they were designed to be driven—fast" (Aetna brief at 31) remains an unfounded assumption.

(Order and Adjudication, 1/10/91, pp. 32–33.) and further:

Based on the record established at the hearings, the Commissioner finds that Aetna's refusal to renew policies based on the HLPV list is improper under Act 78 as interpreted by the Samilo case and administrative decisions requiring that a "good reason" is one that an insurer demonstrates constitutes a material increase in hazard.

(*Id.*, p. 34.)

The Commissioner ordered that Aetna cease and desist from using the HLPV list to nonrenew policies.

The introductory paragraph of the Insurance Commissioner's opinion, issued after the only hearing in this case, sets the stage for the discussion of this issue. It points out the following:

Aetna's objections to the draft market conduct report prepared by the Insurance Department and dated December 20, 1989 present an issue of first impression for the Insurance Commissioner. The Insurance Department began conducting market conduct examinations in 1989. *The report on Aetna is the first report to proceed through the administrative hearing process* pursuant to 31 Pa.Code Chapter 58. Accordingly, there are several procedural issues to be addressed regarding the burden of proof in a market conduct hearing and the ability of the Insurance Department to use the market conduct report proceedings as a basis for imposing civil penalties.

(*Id.*, p. 18, emphasis added.)

Aetna correctly points out in its argument that nothing in Section 3 of Act 78 specifically prohibits the use of this list in its renewal policy. But the Insurance Commission counters that in *Samilo v. Insurance Department*, 98 Pa.

Commonwealth Ct. 232, 510 A.2d 412 (1986), this Court held that insurers could use "any good reason" not specifically stated in section 3 of Act 78 for refusing to renew. The Commissioner concludes that non-renewal based on the HLPV list is not a good reason because there was no proof that vehicles on the HLPV list increased the risk. She also concludes that using this list is a violation of Section 3.

The difficulty the Court encounters in determining the the validity of this order is occasioned by the novelty of the proceeding before us. The case before us does not concern an individual instance of an insurer failing to renew an individual policy such as was the case in *Samilo, Travelers,* and *Erie Insurance Company v. Foster,* 126 Pa.Commonwealth Ct. 600, 560 A.2d 856 (1989), where this court can determine whether the nonrenewal is for good cause. Rather, it involves a blanket order by the Commissioner that an insurer's general reason, *outside the specific prohibitions contained in Section 3 of Act 78, can never be good cause for non-renewal.* As noted by Aetna, such a sweeping prohibition would force insurers to renew even if the vehicles contained an admittedly dangerous design such as have occurred in the past.[2]

The dilemma has been further complicated by the Insurance Commissioner seizing upon language in those cases involving individual insurers to sustain her position in pursuit of a commendable, albeit over-inclusive, end.

The Insurance Commissioner interprets *Samilo* to mean that if there is not good reason to non-renew, there is a violation of Section 3. This interpretation is erroneous.

■ In *Samilo,* a case in which an insurance company refused to renew a policy because the insured was drinking while driving and had an accident, this Court said:

"Section 3 of Act 78 lists specific reasons which may not be used by an insurer to refuse to renew a policy of automobile insurance. Drinking while driving is not

2. Had the Commissioner's order been in effect in the late 1970's, insurers would be required to write and continue policies on Ford Pintos, automobiles proven to be dangerous because of their design.

among those listed. Where some things are specifically designated in a statute, things omitted should be understood as having been excluded; this principle is that expressed by the maxim "expressio unius est exclusio alterius." *Latella v. Unemployment Compensation Board of Review*, 74 Pa. Commonwealth Ct. 14, 459 A.2d 464 (1983). Any good reason not specifically stated in Section 3 of Act 78 as a reason for refusing to renew a policy may be considered by the insurer in its determination regarding renewal.

*Id.*, 98 Pa.Commonwealth Ct. at 234–235, 510 A.2d at 413.

The Insurance Commissioner's interpretation by adjudication places the "lack of good cause" into Section 3 as a specific violation. This is the very interpretation rejected by *Samilo* and it is therefore rejected here.[3] *Samilo* holds that if a good cause exists which is not expressly proscribed by Section 3, then that cause may be considered in an insurer's policy renewal decisions. It does *not* hold, or even imply, that any nonrenewal which lacks good cause is automatically a violation of Section 3.

However, that is not the end of the matter because the scope of the market conduct report mentioned above grants to the Commissioner broad powers to make recommendations regarding the adoption or cessation of "business practices or plans" which are adverse to the interest of policyholders, even though they do not fall within the specific prohibitions found in Act 78, Section 3.

Section 213 provides that when these recommendations are made they are submitted to the insurance company and accepted or challenged by way of objections, and ruled upon by the Commissioner. Then, as in this case, the matter may be appealed to this Court for review under the standards previously set forth.

This procedure provides the opportunity for a willing insurance company to welcome outside suggestions in the form of recommendations, discuss them with the Commis-

3. We of course, do not hold that an insurance company can nonrenew without good cause.

sioner or her authorized agent and reach agreement. It also allows the Insurance Commissioner the latitude to regulate an insurance company by cease and desist orders, affirmative orders and, of course, confers discretion to proceed in appropriate cases to the penalty phase on those unlawful incidents uncovered by the market conduct investigation and report.

We therefore hold that the Commissioner's January 10, 1992 adjudication is in error as stated because Aetna's use of its HPLV list is not, as a matter of law, a violation of Section 3 of Act 78. However, the Commissioner was correct in issuing her cease and desist order prohibiting Aetna from establishing and implementing *a blanket policy* of refusing to write business covering all vehicles listed on its HPLV list, although, in individual cases, certain vehicles on that list may have characteristics which provide a valid good cause for non-renewal.

By virtue of this qualification, we by no means hold that ownership of any one of the vehicles on the HLPV list is always a good reason for non-renewal or that the Commissioner is in any way restrained from holding in individual cases that "good cause" for non-renewal has not been established or that the Commissioner is restricted from promulgating regulations which deal with the situation presented by the problem of the HLPV list.

### Notification When Agency Terminates Agency Relationships

The next question involves a similar, all-inclusive order of the Commissioner. It concerns the duty of the insurer when the *agent* terminates his agency. Both parties admit that Section 3 of the Act imposes duties on the insurer when the *insurer* terminates the *agency*. Section 3(c) and (d). There is nothing in this section providing for an insurer's duties when its agent initiates the termination, however.

We do not agree with Aetna that this section relieves it of all duties when the agent ends the agency, for,

in essence, when that occurs (as the Insurance Commissioner found) the failure of Aetna to take any steps may be characterized as a passive nonrenewal. Again, the Commissioner reasons from *Samilo* that this "passive non-renewal" was not for good cause and therefore a violation of Section 3. Under the same reasoning used in disposing of Aetna's HPLV objection, we reject the Commissioner's interpretation of this practice as a violation of Section 3, but sustain the order under her power to recommend and enforce business practices to protect policyholders.

In defense of the business practice proscribed by the Commissioner's order, Aetna proposes the argument that an agent, when terminating his relationship with Aetna, notifies the policyholders anyway and places the insurance elsewhere. Aetna maintains that any notice from it will only result in confusion with the notification by the agent. Certainly a well drafted notice from Aetna would obviate any confusion and, on the contrary, further serve to protect the consumer.[4] This is a primary purpose of the Act. *Metropolitan Property and Liability Insurance Company v. Insurance Commissioner*, 517 Pa. 218, 535 A.2d 588 (1987).

In summary, we hold that the adjudication of the Insurance Commissioner is improper is insofar as it held Aetna to be in violation of Act 78 for refusing to renew policies on Aetna's HPLV list and for failing to notify insureds upon agency termination. We uphold the Commissioner's order directing that Aetna cease and desist from these practices.

### The Penalties

Since, as the Commissioner noted, this is "the first report to proceed through the administrative hearing process" and is obviously the first instance in which penalties are imposed as a result, it is extremely important that the proper procedure is followed so that all the insurance companies

4. At 31 Pa.Code § 61.5, the Department has promulgated regulations setting forth the requirements for notices of cancellations or refusals to renew, and has adopted sample forms of notice, as shown in Appendices A, B and C of that Code section.

will be placed on notice of the possible consequences, not only of the market conduct examination itself, but also of the effect of an insurer's agreeing to the findings contained in that report. Equally important is notice to insurance company of the procedure to be followed and the issues to be considered when the company files objections, the scope of the hearing on those objections and the method by which penalties will be imposed.

In order to determine whether the proper procedure was followed, it is first necessary to outline what occurred in this instance. Initially, a draft market report was rendered. This report made no mention of penalties, but merely outlined certain sometimes broad and sometimes specific findings of improper acts on the part of Aetna.

Commendably, Aetna accepted a great many of the recommendations for reform. It also objected to the findings on the four business practices stated above.

The hearing then proceeded. At the beginning of the hearing, the presiding officer stated:

> At the prehearing conference on April 19, counsel were able to narrow the issues to be addressed in this hearing to four issues which all seemed to concern Act 78. Just briefly and counsel will not be bound by my characterization of these issues, I understand the first issues concerns [sic] nonrenewals of automobile policies where an agent terminates its contractual relationship with Aetna.
>
> The second issue is the use of inexperience as an underwriting guideline, the third issue is the use of two accidents within 36 months under the McDonald case. And the fourth is underwriting guidelines concerning high loss performance vehicles.
>
> Aetna as the moving party has the burden of going forward in this proceeding.

(N.T., of Testimony, 4/27/90, pp. 6–7.)

Nothing was mentioned in this hearing regarding penalties except, in ruling on an objection, the presiding officer stated:

[W]e discussed possible procedural aspects of pursuing the penalty portion of this proceeding separate and distinct from this portion. And I'm going to allow this line of questioning to the extent it might have a bearing upon mitigation of damages. And counsel for Aetna indicated that if, in case we do need a second proceeding or hearing, she would not produce redundant testimony. So with that in mind, we're going to continue with this line of questioning.

(N.T., 4/27/90, p. 312.)

This statement alone does not support the categorical assertion made by the Insurance Department in its brief that Aetna had full notice and ample opportunity to present mitigating evidence. Indeed, the hearing officer's statement appears to support Aetna's contention that it expected a second hearing in which it would be told what penalties would be sought for what violations, after which it could present evidence of mitigating circumstances.

Instead of a further hearing, however, and without any notice of what particular violations the Insurance Commissioner would use to support penalties, the Insurance Commissioner ordered the parties to submit briefs. She considered these briefs and then imposed the penalty of $96,-000.00.[5]

■ Aetna's first argument against the imposition of *any* *penalties* is based upon the fact that the act authorizing the preparation of the market conduct report does not contain any authority for the imposition of penalties. This statement is correct, but penalties were imposed for various statutory violations uncovered by the market conduct examination, which violations the Commissioner argues were admitted by Aetna or resolved against it after the hearing. Therefore, the penalties were properly assessed under the

5. We do note that the Insurance Commissioner imposed a penalty that was substantially below the statutory maximum for all the contested violations alone ($390,000), below the amount recommended by the Insurance Department ($103,000) and substantially below the statutory maximum for all violations in the market report, contested and uncontested. ($3,339,000).

authority conferred by Section 213 to ensure that a company "has complied with the provisions of the law," and pursuant to the penalty provisions of the various acts imposing penalties.[6] There is no argument, and cannot be, that inclusion of these violations in a market conduct report insulates Aetna from a further proceeding either to enforce the cease and desist order or impose penalties in appropriate proceedings.

■■ However, we are convinced that the Insurance Commissioner did not follow the designated or proper procedure in this case and that Aetna did not, as the Commissioner insists, waive its right to a procedure in which a separate hearing on recommended penalties would be held.

The Insurance Commissioner argues at length that Aetna waived its rights to the procedure prescribed under the Administrative Agency Law. But we have examined the post-hearing brief filed by Aetna when it was ordered to do so in lieu of a separate hearing.[7] We find that the assertion of waiver by the Commissioner is simply not so. Aetna's brief states:

6. The market conduct report in this instance cited over three hundred violations of Act 78, as well as numerous violations of several other insurance regulatory statutes. Each of these cases contains a penalty provision. Section 10 of Act 78, 40 P.S. § 1008.10 authorizes the imposition of a fine not to exceed five thousand dollars on any individual or insurer who violates any of that act's provisions. Section 8 of Act 86, Act of July 3, 1986, P.L. 396, 40 P.S. § 3408, provides for the imposition of fines of not more than five thousand dollars for each violation of that law. Section 16 of the Casualty and Surety Rate Regulatory Act, Act of June 11, 1947, P.L. 538, *as amended,* 40 P.S. § 1196, authorizes penalties or up to five hundred dollars for each willful violation. Section 623, Art. VI of the Insurance Company Law of 1921, 40 P.S. § 253, declares that writing insurance business through anyone without a license is a misdemeanor, punishable by a fine not exceeding one thousand dollars.

7. As we have stated, the Commissioner acknowledged in her January 10, 1991 order and adjudication that the presiding officer advised the parties a second, penalty proceeding would be scheduled. Nonetheless, she declined to direct that such a hearing be held and instead ordered the Department and Aetna to submit memoranda recommending and opposing penalties.

More significant, however, is the fact that the procedure established by law for imposing penalties would be completely abandoned were the Insurance Commissioner to follow the Insurance Department's recommendation. As noted herein, penalties can be imposed only after issuance of an order to show cause pursuant to 1 Pa.Code § 35.14, and no such order has been issued to Aetna as a consequence of the market conduct examination.

(Reply Memorandum of Law of Aetna, *et. al.*, 2/12/91, p. 1.)

Aetna in its brief proceeds to ask for a pleading which would cite specific facts and statutory violations for which a civil penalty or other sanctions are sought to be imposed. This is precisely the procedure contemplated by the administrative code.[8]

These rules of administrative practice and procedure apply to the Department, 2 Pa.C.S. § 501, were adopted by the Insurance Department in implementation of the Administrative Agency Law, 31 Pa.Code § 56.1, and must be followed. Nothing authorizes the Commissioner to use the hearing on the objections to the market conduct report for the dual purpose of resolving objections and imposing penalties.

One additional matter requires discussion. Again, the Commissioner's opinion is relevant. After noting the novelty of this proceeding, she stated:

> there are several procedural issues to be addressed regarding the burden of proof in a market conduct hearing and the ability of the Insurance Department to use the market conduct report proceedings as a basis for imposing civil penalties.

(Order and Adjudication, 1/10/91, p. 18.) and concluded as follows:

---

**8.** 1 Pa.Code § 35.14. Orders to show cause.
Whenever an agency desires to institute a proceeding against a person under statutory or other authority, the agency may commence the action by an order to show cause setting forth the grounds for the action....

Allocating the burden to the Department is necessary in order for the Department to request the imposition of civil penalties for violations. The Department cannot simply rely on the issuance of the draft report. Until competent and reasonable evidence is presented at the hearing, or unless the parties agree to facts contained therein, the draft report's allegations remain allegations and not substantive proof of violations.

(Order and Adjudication, 1/10/91, p. 19.)

However, this determination of the effect of Aetna's agreement to the Department's findings was not made until *after* the hearing in which Aetna admitted to the facts *without being aware of the consequences.* We agree with the Commissioner that allegations contained in draft market conduct reports are just that—allegations—until adequate proof of them is given. Moreover, we hold that, since Aetna was not on notice of the effect of agreeing to the findings contained in the market conduct report, Aetna is not bound by its admissions of facts in this case.

Since we are vacating the Commissioner's penalty order of February 25, 1991, we hesitate to make any definitive orders regarding the proper procedure. However, the Administrative Agency Law would at the very least require the Department to in some way advise a company of those violations which it is pursuing to a penalty phase prior to the hearing that must be provided. Likewise, the Department must, after releasing its report or otherwise prior to a hearing on the objections, advise the company of the specific penalty it will seek for each violative act rather than assess a lump figure. Without such specific citations of violations, a company cannot fairly defend its actions.

Finally, while it is true that the Commissioner is granted wide discretion in imposing sanctions, this court cannot properly review that discretion when, on appeal, we are presented with an order containing a single, bulk-figure

penalty. Therefore, any order imposing penalties must necessarily set forth specific violations and the penalty imposed for each of them.

In conclusion, we hold in this case that the Insurance Commissioner violated the Administrative Agency Law in the method utilized [9] in imposing the penalties. Accordingly, we will vacate this order and remand for a penalty hearing consistent with this opinion.

## ORDER

AND NOW, this 16th day of March, 1992, it is hereby ordered that the adjudication and order of the Insurance Commissioner in the above-captioned matter, dated January 10, 1991, is affirmed as modified by this opinion.

It is further ordered that the order of the Insurance Commissioner dated February 25, 1991, is vacated and this case is remanded for proceedings consistent with this opinion.

Jurisdiction Relinquished.

---

**9.** The Commissioner states "[i]n all future Market Conduct hearings, the two proceedings shall be combined and penalties, if appropriate, shall be imposed by the Commissioner upon approval of the draft market conduct report." (Order and Adjudication, 1/10/91, p. 39.) We pass no judgment on whether this action is made possible by agreement or by an appropriate regulation which provides adequate notice of the procedure by which penalties will be sought for statutory violations uncovered during a market conduct examination.